## KINGREY v. NEW YORK, C. & ST. L. R. CO.

(Circuit Court of Appeals, Sixth Circuit.  March 14, 1924.  Rehearing Denied April 11, 1924.)

No. 3949.

1. **Railroads ⚙⇒400(2)—Knowledge of position of employee of bridge contractor held for jury.**

　　In an action against a railroad for injuries to a bridge contractor's employee, sustained when an awning projecting from a locomotive cab struck a scaffold on which he was working, refusal to instruct peremptorily that the railroad should have known of his position on the scaffold *held* not error; the question under the evidence being for the jury.

2. **Railroads ⚙⇒401(1)—Instruction on care required as to bridge contractor's employee held sufficient.**

　　In an action against a railroad for injuries to a bridge contractor's employee, sustained when an awning projecting from a locomotive cab struck a scaffold on which he was working, instruction as to railroad's duty to operate train so as to avoid injury *held* sufficient.

3. **Appeal and error ⚙⇒882(14)—Plaintiff could not complain of submission of issues raised by him.**

　　Plaintiff could not complain of instructions submitting grounds of negligence charged in his petition, and in support of which he presented testimony.

4. **Appeal and error ⚙⇒216(1)—Failure to give instruction not requested not considered.**

　　The Circuit Court of Appeals will not consider court's failure to give an instruction not requested, except to prevent a miscarriage of justice.

⚙⇒For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes.

5. **Appeal and error** ⟨⟩263(3)—**Refusal to give instruction not considered, in absence of exception.**

Refusal to give instruction will not be considered, in the absence of an exception, except to prevent a miscarriage of justice.

6. **Appeal and error** ⟨⟩1067—**Refusal to submit issue of railroad's negligence in not sounding whistle held not prejudicial error.**

Where the city in which a bridge contractor's employee was injured when a scaffold on which he was working was struck by a locomotive had an ordinance forbidding the blowing of engineer's whistle, except as a signal to apply brakes in case of immediate or impending danger, and there was no evidence of such danger, the plaintiff was not prejudiced by the court's refusal to submit question whether the railroad was negligent in not warning the employee by whistle of train's approach.

7. **Appeal and error** ⟨⟩1067—**Failure to submit question whether railroad should have stationed watchman to warn of approach of trains held not reversible error.**

In an action against a railroad for injuries to a bridge contractor's employee, sustained when an awning projecting from a locomotive cab struck the scaffold on which he was working, refusal to submit question whether the railroad should have stationed a guard or watchman to look for approaching trains and to notify employee thereof *held* not reversible error, in view of instructions as to railroad's duty and the evidence in the case.

8. **Trial** ⟨⟩237(6)—**Instruction on burden of proof held not erroneous.**

Instruction that a plaintiff is entitled to judgment only when by the greater weight of the evidence he "satisfies" 12 men that he is "entitled to have some one else's property turned over to him in satisfaction of his claim" *held* not erroneous.

9. **New trial** ⟨⟩157—**Affidavit of absent witness that he was prevented from attending trial by defendant's claim agent held to entitle plaintiff to have the matter inquired into.**

In an action for injuries to independent contractor's employee, affidavit of another employee, who was working with plaintiff when the accident occurred, that he intended to testify for plaintiff, but on the day before the trial was given a drink by two strangers, one of whom he identified as the railroad's claim agent, that the drink made him unconscious for eight days, and that he would give certain testimony for plaintiff, *held* to entitle plaintiff, on motion for a new trial, to have the charges against the claim agent inquired into and passed on, and it was error to deny the motion without inquiring into its merits.

In Error to the District Court of the United States for the Northern District of Ohio; D. C. Westenhaver, Judge.

Suit by Walter H. Kingrey against the New York, Chicago & St. Louis Railroad Company. Judgment for defendant, and plaintiff appeals. Affirmed, with instructions.

Louis H. Winch, of Cleveland, Ohio (John A. Cline and Payer, Winch, Minshall & Karch, all of Cleveland, Ohio, on the brief), for plaintiff in error.

D. R. Wilkin, of Cleveland, Ohio (Wilkin, Cross & Daoust, of Cleveland, Ohio, on the brief), for defendant in error.

Before KNAPPEN, DENISON, and DONAHUE, Circuit Judges.

KNAPPEN, Circuit Judge. Plaintiff brought this suit to recover for personal injuries received by him while employed as a riveter in the erection of a bridge at Cleveland, Ohio, over the railroad right of way, for eliminating grade crossings. The injuries were received

⟨⟩For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

through the collision of defendant's locomotive engine with a plank of the scaffold or platform on which plaintiff was sitting while operating a pneumatic hammer. There was trial by jury, with verdict and judgment for defendant. The platform (which was said to be about 12 to 14½ feet above the ground) was constructed by placing four planks (two on each side of an iron column) at right angles with the railroad tracks, crosswise of two needle beams suspended from a girder by a rope at each end of each beam; one beam being on each side of the column, and both needle beams being lashed thereto. The inner end of each plank is said to have extended 9 or 10 inches beyond the column. Spreader bolts were supposed to be used to keep the planks from moving. Estimates of the clearance between the ends of the planks and the "track" varied from 9 to 15 inches.[1]

The collision was caused by an awning or sunshade which projected from the side of the cab, about 1½ inches when up and 11 inches or more when down. The grounds of alleged negligence charged included (in addition to several others) failure to sound whistle, signal, or warning, or to maintain watchmen or flagmen, for the purpose of apprising plaintiff of the approach of the train, or at a sufficient distance from the work to warn the oncoming train of plaintiff's dangerous position, and in operating the train with a cab awning so projecting over the rails as to be likely to strike plaintiff. The claimed errors on the part of the trial court, as summarized in plaintiff's brief, will be referred to in their order.

[1] 1. It is contended that there was error in not stating to the jury that the defendant was liable if, without notice or warning, it ran the train past the scaffold on which plaintiff was working with an awning projecting so far from the cab that it was likely to strike a scaffold erected in the ordinary way for the purpose of doing riveting on the columns; "it being admitted that defendant had full knowledge that such work was then going on upon this particular bridge." No instruction to this effect was in terms asked, nor was there exception to the failure to so instruct.

The specific instruction requested previous to the giving of the charge (and to whose refusal exception was taken) was that the plaintiff "was an invitee on the tracks, and it was the duty of the railroad company to exercise ordinary care not to injure such invitee, and after they knew or ought to have known of the presence of the plaintiff, they must exercise reasonable care not to interfere with him." This request was denied, for the reason that it was understood by the court to mean that defendant "ought to have known of plaintiff's position there, and in the light of that knowledge ought to have taken some definite form of precaution"; the judge adding that he could not "give that as a binding instruction." No suggestion was made that the court misconceived the meaning of the request. On the contrary, at the conclusion of the charge, counsel suggested an instruction (also refused against exception) "that, because the plaintiff was invited to be at the place and at work there, they [defendant] must take cognizance of the fact and be held to have knowledge of the fact."

---

[1] "Track" apparently does not mean "rail," but "train" or track clearance.

We think the refusal of the instruction actually requested was not error, and for the reason that the court would not have been justified, under the evidence, in charging peremptorily that defendant ought to have known of plaintiff's position. Plaintiff was employed by an independent contractor, which managed and directed its own work, and in the course of a construction covering a long period of time. It appears that structural steel was not, at the time of the collision, in course of erection at the location in question. While the switchman on the colliding train testified that the "whole crew [presumably meaning the switch train crew] knew men were working on the bridges, and that is why slow orders were issued," not only does that fall short of asserting knowledge by defendant that riveting was being done within colliding distance from the track, but the engineer testified that as he approached the bridge he saw no men working around it, that he was "looking ahead to see if there was any obstruction in front of him," and that "there was nobody working there that I could see." There seems to have been no flag or other warning on the work. The scaffolding was on the engineer's side. The train came from the east, and plaintiff was seated on the west side of the column, from which position he could apparently not readily, at least, see the engine coming, while he was using the hammer. It was open to inference that under such conditions the engineer could not readily see plaintiff. The fireman said that, as he looked at the bridge, he saw no men working on the scaffold, and that as he passed under it he did not know that any men were working there. The construction company's foreman, in charge of the work, testified that:

"The only time we asked for any protection for the workmen for our own self-protection from the railroad company was when we had our equipment * * * fouling the main line during the course of the erection of steel only. When driving rivets, * * * every man was cautioned by myself, and we were all to be on the lookout for any trains or anything that might come along and hit the scaffold at any time."

He says, also, that he ordered the men to keep a lookout for the trains when they were driving rivets, that there were nine men other than plaintiff who were to be looking out, and that the foreman was absolutely to look out for them too. Plaintiff testified that, when a scaffolding was swung down from an overhead bridge like that, and he knew a train was coming, they would always pull the scaffold up until the train went by; that, had they known the train was coming, he would have pulled the scaffold up higher, so as to give greater clearance than was then had; also that he would have gotten out of the way—grabbed the column on the lacings; that up to that morning they had been the only riveting gang on that particular job, and that he had not done any riveting on that job before that morning (it is inferable that the colliding train came through within about half an hour after plaintiff began work); and that the boss was usually staying on the job and "would holler when a train was coming." He also said that he had seen a passenger train go east that morning, but that he did not hear the engine in question before it came, and did not know that the train which caused the collision was coming.

[2] We think there was thus testimony at least tending to show that when only riveting was being done the workmen were expected to keep out of the way of trains and to protect themselves. The court, however, instructed the jury that if defendant knew, or in the exercise of ordinary care should have known, that the plaintiff was working in and about its tracks, although overhead of the tracks, in the construction of the bridge, in a situation where he was or would reasonably be likely to be in danger by the operation of the train over the track past the place where he was working, then defendant "owed him * * * the duty of operating its train in such a way as would not unreasonably hazard his safety, * * * as would be reasonably consistent with his safety," thereby imposing a duty of giving a reasonable warning and notice of the approach of the train, and of operating it at such a reasonable rate of speed that a reasonable notice and warning would be reasonably adequate to protect the plaintiff or enable him to obtain a place of safety. There was testimony by plaintiff and others tending to show that awnings were not ordinary equipment on trains. The assistant foreman of the roundhouse testified, however, that the awning in question was then "standard equipment" furnished by the railroad on all yard freight engines (which the engine in question was said to be), but not on passenger trains.

The jury was instructed that if the ordinary method of operation which the plaintiff was carrying on, and of which defendant knew or should have known, was safe in the operation of the ordinary and usually equipped rolling stock, it would owe the further duty not to operate such rolling stock past the scaffold where plaintiff was working equipped in a different way, which might add different hazards, *without taking further and additional precautions by way of lookout on the train or giving notice to plaintiff*. The context indicates that by "equipped in a different way" reference was made to the cab awning. We see nothing to criticize in the use of the words above italicized. In view of the state of the evidence, we think the charge as given was sufficiently favorable to plaintiff in the respects under consideration.

[3] Plaintiff's counsel contends in brief that the only negligence charged in the petition, which was the real proximate cause of plaintiff's injuries, is that defendant negligently operated a train upon its tracks with an awning extending therefrom an unusual distance from the side of the cab, which was likely to and did strike the platform upon which plaintiff was working, and that there thus should have been submitted to the jury the single inquiry whether the railroad company, by the use of this awning where it knew men were working on scaffolds in close proximity to the track, exercised ordinary care not to injure plaintiff, and that the trial judge submitted other confusing and misleading inquiries to the jury. It would seem sufficient to say that plaintiff cannot well complain of instructions regarding the grounds of negligence charged in the petition, and in support of which plaintiff presented testimony.

[4, 5] 2. Plaintiff contends that the court erred, not only in refusing to submit to the jury the failure to sound the whistle as a warn-

ing of the approach of the train in question, but also in withdrawing from the jury's consideration the claim that a duty rested upon de-. fendant to station a guard or watchman to look out for approaching trains and to notify plaintiff. Neither of these criticisms is based upon request to charge or supported by exception. ·Plaintiff is therefore not entitled as of right to have them considered, and we ought not to do so unless to prevent a miscarriage of justice. Such is the rule even in criminal cases. Allis v. United States, 155 U. S. 117, 122, 15 Sup. Ct. 36, 39 L. Ed. 91; Robilio v. United States (C. C. A. 6) 291 Fed. 980, 981.

[6] As to the claimed negligence in failing to blow the whistle, we think it plain that plaintiff is not prejudiced by the court's action. The necessity of giving warning by bell, and whether it was in fact sounded, was submitted to the jury. The ordinance of the city of Cleveland—A, § 1864—forbids the sounding of a railway engineer's whistle within the city limits, except as a signal to apply brakes in case of immediate or impending danger. This case was not brought within that exception. Imminent danger of collision seems not to have occurred to the engine crew, or to any one on the construction job, until the instant of actual impact.

[7] As to failure to station a guard or watchman: As already said, the question of duty to ring the bell was submitted to the jury. The latter was also told that, if the engine was not constructed (evidently including equipment) "so far away and out of danger that an ordinarily careful and prudent person would not apprehend that it would come into contact with the persons working upon" the platform, then the defendant owed the duty of taking reasonable precautions in the rate of speed, "the matter of *warning*, in the matter of *lookout*" which an ordinarily careful and prudent person would take—the engineer's duty even to stop the train (if possible thereby to avoid hurting plaintiff) being asserted, if he knew and apprehended, or should have known or apprehended, that plaintiff was then and there in a place of danger. In this state of the record, including the testimony referred to in the preceding division of this opinion, as well as the testimony regarding general practice as to having watchmen, and the charge as a whole, we think the withdrawal of that question was, to say the least, not of such importance or so clearly wrong as to call for a reversal, even if it be thought (as we do not hold) that the charge laid too much stress upon the testimony of the construction company's foreman already referred to.

[8] 3. In charging that the burden of proof of defendant's negligence was upon the plaintiff the court said:

"If one comes into court and asks that a jury or court award to him a judgment, the effect of which is to transfer property from the possession of one man to another, it is the law that he is entitled to have it only when by the greater weight of the evidence he satisfies 12 men that he is entitled to have some one else's property turned over to him in satisfaction of his claim of this injury."

No exception was taken to this instruction. The criticism of the word "satisfies" we think not well made. The jury should be satisfied of the correctness of its conclusions both in criminal and in civil

cases—in the former, by evidence beyond a reasonable doubt; in the latter, by the greater weight of the evidence—and the court gave the correct measure. The expression "entitled to have some one else's property turned over to him" was an unhappy one; but we are not convinced that it was worse than that. From a careful consideration of the entire history of the trial, we are not satisfied that this unfortunate plaintiff failed to receive a fair trial. While there was evidence of defendant's negligence, there was also evidence which, if believed, would justify a conclusion of contributory negligence, especially in the testimony that plaintiff could have seen the engine when about 450 feet away, and plaintiff's testimony that he could have heard the bell, had it rung. There was testimony that it was all the time ringing automatically; in connection with the testimony of both plaintiff and the foreman, before set out herein, the testimony of the latter that he warned his entire gang about five minutes before the accident to look out for the engine; and in the testimony that plaintiff had assisted in lowering the scaffold not long before his injury.

The judge gave a careful charge, and at considerable length. We cannot think that he intended to "charge the plaintiff out of court." Upon a consideration of the entire record of the trial, we are unable to say that there has been a miscarriage of justice, that the plaintiff was there denied a fair trial, or that, unless for denial of motion for new trial, plaintiff is entitled to a reversal of the judgment.

[9] 4. The overruling of motion for new trial, on the ground of newly discovered evidence, fraud, accident, and surprise, stands upon a different basis. The defense that plaintiff was guilty of contributory negligence seems to have figured prominently on the trial. In this court defendant contends that the evidence showed that plaintiff was sitting on two planks of the scaffold, one of which had no spreader bolts; that he did not look at the planks, to see whether or not they were so protected, but admits that such bolts in both places would have prevented spreading. Defendant also contends here that the approaching train could have been seen by plaintiff 450 feet away, that it was seen by another witness, and that plaintiff could have seen it and protected himself, had he observed its approach.

Presumably these contentions were forcibly pressed on the trial. The judge, in denying the motion for a new trial, said: "The fact is that this unfortunate plaintiff owes his injuries to his own neglect." Defendant introduced, on the trial, testimony of a witness that at the time of the collision the cab awning was not down, but was "right up tight to the cab," as well as the testimony of another witness that the awning was but halfway up, and so projected about 7 or 8 inches from the cab. If either of these statements was true, the collision could not have occurred unless the planks extended further into the clearance space than asserted by witnesses apparently well informed of the facts, as might have occurred in the absence of spreader bolts.

One Bolan, who admittedly was working with plaintiff on the platform when the collision occurred, but who did not attend the trial, made affidavit, presented upon the motion for new trial, that pursuant to a promise to plaintiff to attend the trial (without subpœna) he arrived in Cleveland—from Pittsburgh—the day before the trial was

to open, intending to be such witness; that on the day of his arrival he had a drink which he thought was whisky, on the invitation of two strangers whom he met at a soft drink parlor, and shortly thereafter lost consciousness and afterwards knew nothing of his whereabouts for about eight days; that he is advised by a named Cleveland physician that he was the victim of some drug; that by reason of the drink and drug therein he was unable to attend the trial; that he identifies one of the men who gave him the drink as a named claim agent of defendant, whom he had since seen several times "and is positive of his identity." Bolan's wife makes affidavit, by way of partial identification at least of the claim agent referred to, as "the same party who was following her husband while he was in Pittsburgh"—apparently meaning on the day he left for Cleveland.

Bolan's affidavit further states that when plaintiff was injured there was a clearance of about 15 inches between the scaffold and the cab; that the awning was down and projected at least 16 inches from the side of the cab; that the train approached without sounding bell or whistle, and that he had no warning of its approach; that the construction foreman did not give plaintiff or any one else any warning to look out for any train (plaintiff does not seem to have disputed the foreman's testimony, which was given after plaintiff had testified); that the train in question was running about 15 miles an hour, and was not in sight when the driving of the particular rivets on which they were engaged was commenced; that the scaffold was at no time lowered on the day in question, as was testified to by at least two witnesses; that the two inner planks were securely fastened, and that the four planks were about 6 feet long and extended about 5 inches over the needle beams. There was presented an affidavit of another person who says he and another named man built the scaffold in question, and worked continuously on the job from that time until plaintiff's accident, and were present when it occurred; that the planks used were but 6 feet long and extended only 4 inches over the sides of the needle beams; that the center planks had safety bolts, which prevented the planks and scaffolding from moving; that he removed some bolts from one of the planks knocked off by the collision and assisted in removing plaintiff to the hospital; that there was at least 18 to 20 inches' clearance between the planks and the sides of the passing train; that the awning was down at the time of the accident; that the scaffold was not lowered on the morning of the accident, nor at any time after its construction. There were also affidavits by three persons by way of impeachment of the testimony of one of defendant's witnesses. The contents of two other affidavits call for no mention.

Defendant made no response to these affidavits or to the motion for new trial. Its counsel say in brief that the court disposed of the motion sua sponte, without notice to counsel on either side. Defendant's counsel characterize appellant's charge as "preposterous and unthinkable on its face." We think the motion should not have been denied without showing that defendant's claim agent did not commit the asserted misconduct. We appreciate that the charge of misconduct may be utterly untrue in fact, but we think it cannot be pronounced, as matter of law, on its face preposterous and unthinkable. Granting

that Bolan's statement on the merits is cumulative, it is, if true, of more than ordinary importance to plaintiff, for the reason, among others, that one witness on the trial positively, the other according to recollection, stated that Bolan was the one who assisted plaintiff in lowering the scaffold. His unexplained absence would naturally be embarrassing to plaintiff.

Granting, for the purposes of this opinion, that, except as the motion involved defendant's alleged responsibility through its agent for the asserted fraud and contempt of the trial court, we should be inclined to regard the motion as addressed to the discretion of the judge, and thus not reviewable, because denied in the exercise of judicial discretion, we think the dismissal of the application without examination of the truth of the alleged fraud and contempt of court was not matter of discretion. As the merits of the application have not been inquired into, the judgment should not be reversed merely for failure to make such inquiry; to do so would be to punish defendant without hearing. But we think due regard for the administration of justice requires that such hearing be had.

Following the precedent in Wolf v. United States (C. C. A. 6) 292 Fed. 673, 678, 679, and Hindman v. United States (C. C. A.) 292 Fed. 679, 683, the judgment of the District Court is affirmed, with instructions to hear and decide the motion for new trial, if re-presented within 10 days from the going down of mandate, upon giving defendant opportunity to be heard thereon, and, if it be made to appear that defendant's agent or representative has been guilty of the asserted misconduct, to set aside the judgment and grant a new trial. Unless such misconduct shall appear, the motion for new trial is submitted to the sound discretion of the court; subject to the contingencies above provided, the existing judgment to stand. The costs of this court will be divided.

### On Motion for Rehearing.

PER CURIAM. Plaintiff in error asks a rehearing and a reversal of the judgment upon the sole ground that the trial court did not deny a motion for new trial sua sponte, and without notice to counsel for either side, as stated in brief of defendant in error and recited in our opinion, but that the motion was not disposed of until more than 60 days after it was filed, nor until long after the rule period for making reply had expired.

We think, however, that our order of affirmance should stand, subject to hearing and decision of motion for new trial. We think we should presume that failure to reply was not intended as an admission of the truth of the fraud and contempt of court charged, but rather that it was due to a belief, as now claimed by counsel, that the charge was "preposterous and unthinkable on its face," which proposition, we think, should not be accepted as matter of law. If the asserted charge of misconduct of defendant's representative is found to be true, a new trial should be granted; if found untrue, upon actual hearing on the merits, in view of what is said in our previous opinion, we should not feel warranted in imperatively ordering a new trial.

Petition for rehearing denied.